UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

OCT 30 2013

PER _____
DEPUTY CLERK

CATHERINE S. JENKINS,
ADMINISTRATRIX OF THE ESTATE
OF LEO FRANKLIN JENKINS, JR.,

    Plaintiff

  vs.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant

No. 3:12-CV-00274

(Judge Kosik)

## MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Leo Franklin Jenkins, Jr.'s claim for social security disability insurance benefits. Jenkins died on March 17, 2010, and the administratrix of his estate has filed this appeal. For the reasons set forth below, we will remand the case to the Commissioner for further proceedings.

Under 42 U.S.C. § 405(g) and relevant case law, the court is limited to reviewing the administrative record to determine whether the decision of the Commissioner is supported by substantial evidence. Counsel for the parties are familiar with

the five-step sequential evaluation process[1] that the Commissioner utilizes and the substantial evidence standard of review.[2]

---

1. The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Commissioner of Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. At step five of the sequential evaluation process, the burden of production temporarily shifts to the Commissioner to produce vocational evidence demonstrating that there are a significant number of jobs in the national economy that the claimant, given his or her residual functional capacity, can perform. Once the Commissioner satisfies this limited burden of production, the burden shifts back to the claimant to prove that the Commissioner cannot rely on the vocational evidence.

2. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Jenkins protectively filed[3] his application for disability insurance benefits on May 15, 2008. Tr. 12, 55, 96-98 and 104.[4] Jenkins claimed that he became disabled on January 15, 2005, because of an injury to his low back which resulted from a slip and fall on ice on January 19, 2004. Tr. 21 and 120; Doc. 6, Plaintiff's Brief, p. 1. Jenkins alleged that he suffered from moderate to severe low back pain, persistence left leg weakness and a need to frequently urinate ("at least a couple times an hour") as the result of three herniated lumbar discs. Tr. 44, 120 and 175. Jenkins' application was initially denied by the Bureau of Disability Determination on August 19, 2008.[5] Tr. 56-59. On September 23, 2008, Jenkins requested a hearing before an administrative law judge. Tr. 62 and 65-66. After 11 months had elapsed, a hearing was held before an administrative law judge on August 27, 2009. Tr. 19-54. A vocational expert testified at the administrative hearing and indicated that if an individual had to urinate as frequently as Jenkins claimed, the individual with the

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on April 17, 2012.

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 56.

3

same level of Jenkins's education and work history would be unemployable. Tr. 52-53.

On September 14, 2009, the administrative law judge issued a decision denying Jenkins's application. Tr. 12-18. The administrative law judge found that Jenkins was a "younger individual"[6] and had past relevant work experience as a butcher's assistant described as skilled, heavy work by the vocational expert, and a customer care representative described as skilled, light work. Tr. 17. The administrative law judge found that Jenkins could perform a range of sedentary work with a sit/stand option and that he could specifically perform the jobs of surveillance system monitor, order clerk and parking lot cashier. Tr. 15 and 18. The ALJ also found that Jenkins's statements regarding his impairments were not credible. Tr. 16-17. In so doing, the ALJ made factual assertions which were erroneous. Specifically, the ALJ stated on two occasions in his decision that an MRI of Jenkins's lumbar spine performed in April 2008 did not reveal any nerve root compression or cord compression. Tr. 16.

After the slip and fall on January 19, 2004, Jenkins was treated at Conestoga Family Practice, located in Terre Hill,

---

6. Jenkins was born on August 14, 1971. Tr. 27, 55, 96 and 104. At the time of the administrative hearing, Jenkins was 38 years of age. Tr. 28. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). A "younger individual" is considered a person whose age would not seriously impact his or her ability to adjust to other work. 20 C.F.R. § 404.1563(c).

4

Pennsylvania by Virginia Shafer, M.D. Tr. 167 and 173. During the initial examination, it was noted that Jenkins's lumbar spinal range of motion was decreased because of pain and Jenkins was prescribed the narcotic medications Darvocet and the muscle relaxant Flexeril, and an x-ray of the lumbar spin was ordered. Tr. 167. That x-ray revealed disc space narrowing at the L3/4 and L4/5 levels and a small anterior osteophyte (bone spur) at the L3/4 level. Tr. 172. At a follow-up appointment with Conestoga Family Practice on January 29, 2004, Jenkins was continued on the medications Darvocet and Flexeril and referred to physical therapy. Tr. 166. An MRI was subsequently ordered and physical therapy discontinued pending the results of the MRI. Tr. 165. The MRI was performed on March 3, 2004, and revealed "multiple level large disc herniations." Tr. 162. Notably there were extrusions of disc material into the spinal canal. Id. The ALJ did not address this MRI in his decision.

On April 2, 2004, Jenkins was evaluated by Marc P. Oliveri, D.O., an orthopedic surgeon, with Orthopedic Consultants, LTD, in Lancaster, based on a referral from Dr. Shafer. Tr. 165 and 173-174. Dr. Oliveri reviewed the March 3rd MRI and stated as follows:

> Review of a lumbar spine MRI was striking in the fact that it did show a left sided three level disc herniation at L/3, 4, L/4, 5, and L/5, S/1. The herniated disc at L/5, S/1 is extruded as well. For a young person, this is one of the worse MRIs I have ever seen.

Tr. 174 (emphasis added). Dr. Oliveri's assessment was that Jenkins was suffering from "[b]ack pain and left leg pain on the basis of lumbar disc herniation which [was] multi-level in nature[.]" Id. Dr. Oliveri further stated as follows:

> Looking at his MRI and his symptoms, I think the herniated disc at L/3, 4 had been causing him the majority of his symptoms. Currently I would not advise any surgical intervention, as his symptoms do seem to be improving and as well as the fact that the patient does not have any health insurance, so I cannot really refer him for any sort of injections. I am going to have him go for some physical therapy though, in an attempt to help him reduce some of his discomfort.

Id. Jenkins remained unemployed except for some brief part-time employment in July, 2004, January, 2005, and January to May, 2008, and apparently did not seek any further treatment until April, 2008, because of lack of medical insurance. Tr. 29-31 and 131.

However, in the interim, Jenkins was evaluated by Don Nguyen, M.D., on February 24, 2006, on behalf of the Bureau of Disability Determination, which evaluation related to a prior application for disability benefits filed by Jenkins. Tr. 175. That prior applications was denied at the initial level and was not administratively pursued on appeal by Jenkins. Tr. 12.

A physical examination of Jenkins by Dr. Nguyen revealed reduced motor function of the left hip flexor and extensor and left knee extensor as well as the dorsiflexion at the left ankle and plantarflexion of the left foot. Tr. 177. Jenkins also had decreased reflexes bilaterally at both knees and ankles and

decreased sensation in the lateral aspect of the left foot and plantar area bilaterally but more so on the left foot. Id. Jenkins's gate was described as "walking with dragging his left leg"; he was "unable to elevate the left lower leg with flexion of the knee" and he was "unable to squat or arise from a squatting position." Id. Jenkins also had "moderate tenderness to palpation in the lower left lumbar area" and "[l]umbar flexion was decreased to 70 degrees[.]" Tr. 177-178.

After conducting a clinical interview and performing the physical examination, Dr. Nguyen's impression was as follows:

> He fell in 2004 and had significant injury to the lower lumbar area with multiple discs herniation confirmed by MRI. These include L3-L4, L4-L5 and L5-S1. There is [] persistent back pain as well as weakness of the left leg that limits him significantly from prolonged walking and standing as outlined. Physical exam today do[es] confirm[] weakness consistent with L4, L5 and S1 deficits. A previous assessment by an orthopedic specialist indicates that he is not a surgical candidate. At this point, he has not [had further] follow-up [] and [is] unable to have further evaluation because of having no medical coverage. His prognosis is certainly guarded. Further evaluation is important to determine whether his herniation is unstable, which can cause further neurologic deficit. His deficits h[ave] been persistent although not worsened since the injury.

Tr. 178.

On April 25, 2008, Jenkins commenced treating with Perry Argires, M.D., an orthopedic and spine specialist, in Lancaster. Tr. 193. A physical examination on that date by Dr. Argires revealed that Jenkins had evidence of left foot drop and weakness in the left extensor hallucis longus which is a muscle of the foot

7

that is responsible for extending the big toe, dorsiflexing the foot (moving the toes towards the shin) and assisting with foot eversion (turning the foot laterally resulting in the sole moving outward) and inversion (turning the foot medially resulting in the sole moving inward). Id. Jenkins also had a positive straight leg raising test on the left. Id. Dr. Argires noted that Jenkins was uninsured and that he was going to help him obtain Medicaid and assist him in obtaining an MRI of the lumbar spine. Id.

The MRI was performed on April 29, 2008, and revealed disc herniations at "the lower 3 lumbar levels" and there was "compression" at the L3-L4 level of the left L4 nerve root; compression at the L4-L5 level of the left L5 nerve root and borderline compression at the L5-S1 level of the left S1 nerve root. Tr. 186.

Dr. Argires reviewed the MRI with Jenkins at an appointment on May 16, 2008. Tr. 202. Dr. Argires informed Jenkins that the MRI revealed herniated discs with free fragments at L3/4 and a herniation at L4/5 with neural compression and he recommended surgical decompression. Id.

On July 30, 2009, Dr. Argires completed on behalf of Jenkins a document entitled "Job Capabilities and Restrictions." Tr. 204-210. In that document, Dr. Argires set forth limitations which precluded Jenkins from engaging in full-time sedentary work. Id. Furthermore, Dr. Argires noted that Jenkins's condition over the next 24 months would deteriorate rapidly. Tr. 209. Dr.

Argires stated that Jenkins had a large herniated disc and needed surgery and that "[h]is symptoms are weakness and foot drop due to compression on the spinal cord." Tr. 210.

On November 5, 2009, after the ALJ rendered his decision, Jenkins submitted to the Appeals Council a document completed by Dr. Argires entitled "Questionnaire For the period March 2004 to Present."[7] Tr. 216. In that document, Dr. Argires stated that Jenkins needed "to urinate one time or more per hour, particularly during an 8 hour work day" and that the MRI showed "a disc herniation with free fragment at L3/4 with neural compression on nerve that requires frequent urination and bladder problems." Id.

At the administrative hearing when posing a hypothetical question to the vocational expert, the ALJ stated that there was no physiological or medical support from a treating or consultative physician substantiating that Jenkins had to urinate at least two time per hour. Tr. 48. Plaintiff contends, inter alia, that the ALJ erred in his assessment of the medical records and that the ALJ's conclusion that Jenkins could engage in a range of full-time sedentary work is not supported by substantial evidence. We find substantial merit in that argument.

It is clear that the ALJ misconstrued the MRI scans which showed that Jenkins suffered from nerve root impingement or

---

7. We do not rely on this document as a basis for remanding the case to the Commissioner for further proceedings, but merely refer to it to complete our review of the administrative record.

9

compression.[8] This error taints the ALJ's conclusion that there was no evidence supporting Jenkins's claim that he had to urinate at least two times per hour which as noted according to the vocational expert would have precluded him from engaging in gainful full-time employment. It also taints the ALJ's credibility assessment of Jenkins. The ALJ stated that Jenkins's "statements concerning the intensity, persistence and limiting effects" of Jenkins's alleged symptoms, one of which was moderate to severe back pain, were not credible. The matter has to be remanded for an ALJ to appropriately consider the MRI scans in light of Jenkins's alleged symptoms.

MRI scans were interpreted by physicians and those physicians prepared reports of their findings and opinions regarding the condition of Jenkins's lumbar spine. An administrative law judge may not disregard the medical opinion of such a physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990). No medical professional indicated that the neural compression revealed by the MRI scans would not cause

---

8. Compression and impingement are synonymous medical terms.

10

Jenkins to urinate frequently or at a rate of at least two times per hour. The ALJ inappropriately engaged in his own lay interpretation of the MRI scans, and in doing so, clearly misconstrued the results of the MRI scans.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g), vacate the decision of the Commissioner and remand for further proceedings.

An appropriate order will be entered.

　　　　　　　　　　　　　／s／ Edwin M. Kosik
　　　　　　　　　　　　　EDWIN M. KOSIK
　　　　　　　　　　　　　United States District Judge

Dated: October 30, 2013